UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


W.W. WILLIAMS MIDWEST, INC.,

       Plaintiff/Counter-Defendant,

v.

LIEN WAVER, her engines, tackle,
and gear,

       Defendant/Counter-Plaintiff.
                                          /

File No. 1:08-CV-410

HON. ROBERT HOLMES BELL

# **O P I N I O N**

This breach of contract action against a vessel is before the Court on the defendant vessel's motion for summary judgment. For the reasons that follow the motion will be denied.

## I.

Plaintiff W.W. Williams Midwest, Inc. ("Williams"), is an Ohio corporation with an office and place of business in Kent County, Michigan. Williams's business includes repairing marine engines.

Defendant Lien Waver (the "Vessel") is a 43 foot vessel owned by the Fickle Miss Corporation, a Delaware corporation, since 1996, and used by the Schwendener family. (Dkt. No. 18, Counter-Compl. ¶ 2; Schwendener Dep. 35.) Michael S. Schwendener

("Schwendener") is the Vessel's managing agent and has a right of possession in the Vessel. (Counter-Compl. ¶ 3.)

In August 2004 Schwendener contacted Plaintiff regarding repairs to the Vessel's engines based on Schwendener's understanding that the Vessel's 692 Detroit Diesel engine had a cooling design deficiency and defective top rings that wore out prematurely, his observation that the engines were emitting black smoke and using oil, and his observation that the Vessel had experienced a slight loss of power and a drop in engine rpm. (Schwendener Dep. 47-48, 80.)

Plaintiff submitted a quote for rebuilding the engines, which included the following comments:

> This quote is for rebuilding both port and starboard engines on the Lein [sic] Waver. This includes teardown, clean up and repair as follows: This includes rebuilding of Heads, repairing injectors as needed. Replacement of cylinder kits, remove and reseal blower to the block. Coolant update. This will be completed by our Frankfort facility. The engine will be painted before delivery to site. This does not include replacement of turbo chargers . . . .

(Ex. 2,[1] 8/24/04 Quote.) Michael Schwendener added the following language to the quote: "1) All parts to be retained. 2) Work to be completed by Sept. 13th." (*Id.*; Schwendener Dep. 52.) Schwendener signed the quote and paid $10,000.00 as a down payment. (Schwendener Dep. 59-60.)

---

[1] In this opinion, references to exhibits 1-13 are to the exhibits attached to Defendant's motion for summary judgment (Dkt. No. 49), and references to exhibits A-Q are to the exhibits attached to Plaintiff's response in opposition (Dkt. No. 52).

The majority of the work on the Vessel's engines was performed by mechanic Don Winters at Williams's Frankfort facility. Williams completed the work on September 29, 2004, and sent Schwendener an Invoice for $38,816.24, minus the $10,000 down payment, for a total balance due of $28,816.24. (Ex. 4, 9/24/04 Invoice.) Schwendener was able to use the Vessel as of October 1, 2004. (Talbot Dep. 33.) On October 6, 15, and 18, Schwendener contacted Winters to report that coolant was being discharged into the bilge. (Ex. 5, Schwendener's Notes.)

In October, Dale Hendershot, another Williams mechanic, investigated Schwendener's complaints and determined that the radiator cap was faulty. He advised that Williams would replace both radiator caps when the fuel pump was replaced. (Ex. K, 10/21/04 Repair Order.) In November, Williams acknowledged that the cylinder head that it had installed either had a defective injector tube or the people who rebuilt the head had installed it improperly. (Talbot Dep. 52.) Williams agreed to repair the engines before the boat was launched in the spring:

> Customer reported that the starbord engine was pushing coolant out overflow. There is an oil leak on starbord engine at the turbo. There is a shifting lag in the port engine. Both port and starbord engines have oil and coolant leaking causing staining of paint. Testing for compression in coolant will be tested when boat is launched. Boat is stored for the winter and will be under warranty when boat is launched. Warranty will commence upon launch of boat in spring (estimated date is May 15, 2005.)

(Ex. L, 11/1/5/04 Invoice.)

On December 7, 2004, Schwendener sent Plaintiff a memorandum of thirteen open items requiring corrective work.[2] (Ex. 7, Schwendener Memo.) Plaintiff did not make any formal response to Schwendener's memorandum, but according to Winters and John Talbot, Williams's Grand Rapids Customer Support Manager, not all of the items on the list were covered by Williams's workmanship warranty. (Winters Dep. 83-85; Talbot Dep. 55, 83; Ex. 11, Talbot-Winters FAXes.) Williams considered the repairs on the Vessel to be complete in May 2005 when they were able to pull off the cylinder head that was causing the

---

[2]The items noted by Schwendener are the following:
1)   Starboard engine exhaust leak in coolant.
2)   Treat and flush carbon out of starboard engine.
3)   Provide new coolant.
4)   Replace carboned plastic expansion tank and tubing.
5)   Low fuel pressure alarms have sounded on both engines after a few hours of continuous operation.
6)   Paint engines to specifications with Glacier white #8000 (PPG #2166716389) paint.
7)   Port engine/transmission is slow to engage. A cable adjustment may be necessary.
8)   Properly support and fasten all cables and wires, and provide proper chafe protection.
9)   <u>Both</u> engines have several oil leaks (each side, front & rear). Note: Port engine is spraying an oil mist on the bilge floor near the front pulley.
10)  Provide oil and coolant sample results.
11)  Retain all used parts to present to D.D.
12)  Provide 6 month guarantee from acceptance of engines.
13)  It appears the cockpit gel coat has been damaged from the black runner layed down last summer. When the exhaust manifold was removed, it was placed on the runner.

(Def.'s Ex. 7.)

compression in the cooling system, replace the injector tubes, and work through some of the leak issues. (Talbot Dep. 33-34.) Williams nevertheless continued to respond to many of the items on Schwendener's list through October 2005. (Talbot Dep. 55, 57; Ex. M & N, Work Hours; Winters Dep. 92-99; Ex. Q, 10/5/05 Repair Order.)

Williams sent Schwendener a revised Invoice on October 6, 2005. (Ex. O, 10/6/05 Invoice). Williams attempted to recover payment from Schwendener after that date, but was unable to make contact with him. (Ex. P, Williams' contact efforts.)

In September 2007, Winters retired from Williams and Williams shut down its Frankfort facility. The parts Winters had removed from Defendant were discarded. (Winters Dep. 32-33, 108-09.)

In May 2008 Plaintiff filed this breach of contract action against Defendant pursuant to the Court's admiralty and maritime jurisdiction, seeking to recover the balance due on labor and materials furnished to the Vessel for the repair of its engines.

Defendant filed a Counter-Complaint alleging that Plaintiff did not properly perform the work contracted for, that Plaintiff's work failed to correct the complaint for which the Vessel was brought in for repairs, that Plaintiff applied improper and defective paint, and that as a result, the Vessel and Schwendener have incurred significant expense and damages. (Counter Compl. ¶¶ 9-13.)

Defendant has moved for summary judgment on Plaintiff's complaint based upon its assertion that Plaintiff cannot maintain a breach of contract action against Defendant because Plaintiff first substantially and materially breached the underlying repair contract.

**II.**

Under Rule 56(c) of the Federal Rules of Civil Procedure, summary judgment is proper if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. In evaluating a motion for summary judgment the Court must look beyond the pleadings and assess the proof to determine whether there is a genuine need for trial. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). If Defendant carries its burden of showing there is an absence of evidence to support a claim then Plaintiff must demonstrate by affidavits, depositions, answers to interrogatories, and admissions on file, that there is a genuine issue of material fact for trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324-25 (1986).

In considering a motion for summary judgment, the court must construe the evidence and draw all reasonable inferences in favor of the nonmoving party. *Minges Creek, L.L.C. v. Royal Ins. Co. of Am.*, 442 F.3d 953, 955-56 (6th Cir. 2006) (citing *Matsushita*, 475 U.S. at 587). Nevertheless, the mere existence of a scintilla of evidence in support of Plaintiff's position is not sufficient to create a genuine issue of material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The proper inquiry is whether the evidence is such

that a reasonable jury could return a verdict for Plaintiff. *Id.*; *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

### III.

Defendant contends it is entitled to summary judgment on Plaintiff's breach of contract action because Plaintiff has admitted that it had substantially and materially breached the underlying contract repair before any alleged breaches by Defendant.

Defendant's motion for summary judgment is based on application of the Michigan rule that one who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform. *Baith v. Knapp-Stiles, Inc.*, 156 N.W.2d 575, 578-79 (Mich. 1968); *see also Able Demolition v. Pontiac*, 739 N.W.2d 696, 701 (Mich. Ct. App. 2007) ("[O]ne who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform.") (quoting *Michaels v. Amway Corp.*, 522 N.W.2d 703, 706 (Mich. Ct. App. 1994)).

This rule only applies when the initial breach is "substantial." *Michaels*, 522 N.W.2d at 707 (citing *Baith*, 156 N.W.2d at 579). For purposes of this rule a "substantial breach" is a breach that has effected "such a change in essential operative elements of the contract that further performance by the other party is thereby rendered ineffective or impossible, such as the causing of a complete failure of consideration or the prevention of further performance by the other party." *Baith*, 156 N.W.2d at 579 (quoting *McCarty v. Mercury Metalcraft Co.*, 127 N.W.2d 340, 343 (Mich. 1964) (citations omitted). "To determine whether a substantial

7

breach occurred, a trial court considers 'whether the nonbreaching party obtained the benefit which he or she reasonably expected to receive.'" *Able Demolition*, 739 N.W.2d at 701 (quoting *Holtzlander v. Brownell*, 453 N.W.2d 295, 298 (Mich. Ct. App. 1990)). The determination of which breaches are "substantial" is "inextricably tied to the particular facts of the case." *Chrysler Int'l Corp. v. Cherokee Exp. Co.*, 134 F.3d 738, 742 (6th Cir. 1998).

Defendant contends that Plaintiff breached the contract in the following respects: (1) by failing to make the repairs in a timely manner; (2) by failing to retain the parts; (3) by failing to correct oil and coolant leaks; (4) by failing to keep promises to correct the paint and gel coat issues; and (5) by failing to submit a final invoice or communicate that the repairs contracted for were ever completed. Defendant contends that these failures, taken together, constitute a whole and complete failure to perform the underlying contract and relieves Defendant of its obligation to pay under the contract. (Def.'s Br. re Mot. for Summ. J. 10.)

**1. Timeliness**

Defendant contends that Plaintiff breached the contract by failing to complete the work in a timely manner. The quote provided that all work would be completed by September 13. (Ex. 2, Quote.) The original work was not completed until September 29, 2004, and Defendant has admitted that the follow-up repairs were not completed until May 2005, at the earliest.

The record reflects that Winters advised Schwendener on September 2 that he was running about a week behind on the engine work. (Schwendener Dep. 73.) Schwendener

testified that he told Winters that he had plans to use the boat in the middle of September. (*Id.* at 74.) There is no evidence, however, that Schwendener communicated any urgency that the September 13 deadline be met. In fact, Schwendener testified that he was sympathetic to Winters' efforts to do the best work he could, and Schwendener did not want to sacrifice quality in exchange for time. (Schwendener Dep. 74.) The Vessel was available on October 1, 2004, and Schwendener used the Vessel in October 2004, and in every season since then.

Based upon the evidence of record, the Court finds there is an issue of fact as to whether the failure to complete the repairs by September 13, 2004, constituted a substantial breach of the contract.

**2. Retention of Parts**

The parties' contract provided that all parts were to be retained. (Ex. 2, 8/24/04 Quote.) Don Winters testified that it was standard procedure to retain parts until a job is completed, but that parts are rarely kept for more than thirty days. (Winters Dep. 32, 113.) Winters also testified that it was not normal business practice to deliver the parts to the customer. (*Id.* at 32.) Williams kept the parts removed from Defendant's engine for approximately four years. During those four years no one from the Schwendener family requested the parts or came to pick them up. When Williams closed the Frankfort facility in the fall of 2007, the parts were discarded. (Winters Dep. 32.)

Given the lapse of time, the normal business practices, the lack of communication, and the size of the parts, the Court concludes that there is an issue of fact for trial as to whether the failure to retain the parts constituted a substantial breach of the contract.

### 3. Completion of Repairs

Defendant contends that Williams failed to complete the repairs contracted for. In support of this contention Defendant contends that Williams has admitted that it failed to properly complete its initial repairs, and that Williams presented contradictory testimony and no written documentation regarding its follow-up repairs. Schwendener has testified that the Vessel continues to have coolant and oil leaks, it is burning more oil, there is grit on the port engine dipstick, and the maximum rpm has dropped. (Schwendener Dep. 118, 120-21, 124, 126-28.)

In response, Williams has presented evidence that Schwendener and his family have continued to operate the Vessel in their typical fashion, operating the engines between forty and seventy hours each summer, including some extended trips (Schwendener Dep. at 111, 114-15); they have not had any additional mechanical work performed on Defendant's engines (*id.* at 116-17); they typically do not operate the Vessel above 2000 rpm (*id.* at 128); and Schwendener has agreed that the coolant and oil leaks are cosmetic and can be cleaned up with a towel (*id.* at 121, 126-27). Williams contends that inasmuch as Defendant is operating the Vessel in a normal fashion, the problems Defendant complains about cannot be deemed a substantial breach of the contract. Williams has also presented testimony from

10

Winters that the work contracted for was properly performed, that many of the continuing problems are not attributable to Williams, and that there is no reason why Plaintiff should not be paid. (Winters Dep. at 82, 111.)

The Court concludes that there are numerous issues of fact concerning what repairs were performed, the extent of the remaining problems, and the cause of the remaining problems that preclude the Court from determining, as a matter of law, whether Plaintiff substantially breached the contract.

**4. Paint and Gel Coat**

Defendant contends that Williams applied the wrong type and color of paint, applied it in an unworkmanlike manner, and caused cracking of the gel coat in the cockpit. (Schwendener Dep. 120, 124.)

Winters testified that he received the paint specifications from Schwendener and gave them to the auto parts store that mixed the paint. (Winters Dep. 86-87.) When Winters investigated Schwendener's complaint about the paint on October 5, 2005, it was Winters' observation that "the paint on the underside of the I beams is same as engine and the paint they put on the back is whiter." (Ex. Q, 10/5/05 Repair Order; Winters Dep. 110.) Winters does not know when the I-beams were painted, but he testified that the difference in the paint on the I-beams was not related to any work that Williams had performed. (Winters Dep. 111.)

11

The evidence presented reveals that there are issues of fact for trial concerning Plaintiff's responsibility for selecting the paint used on the engine, and for painting the areas that allegedly do not match.

There are also issues of fact concerning the damage to the gel coat. Schwendener advised Talbot that Winters damaged the gel coat during the repairs, but Winters does not believe he caused that damage. (Talbot Dep. 86.) The Court has insufficient evidence on the nature of the gel coat issue to determine whether Plaintiff is responsible for the cracking or whether the cracking constitutes a substantial breach of the contract.

**5. Communications**

Defendant contends that Plaintiff failed to submit a final invoice and failed to communicate that the repairs contracted for were ever completed.

The record reveals that there were some unresolved issues between the parties, including which items on Schwendener's list of corrective actions Williams would not be taking responsibility for, and Talbot's representations that he would fix the paint issue, inspect the Vessel himself, and look into the abnormal oil samples. (Talbot Dep. 78-79, 85-86; Schwendener Dep. 99; Ex. 13, Schwendener's 11/1/05 notes.) However, Plaintiff did issue an invoice on October 6, 2005, after addressing many of the items on Schwendener's list, and Plaintiff has presented evidence that sometime after Talbot's November 1, 2005 conversation with Schwendener, Williams attempted, but was unable, to contact Schwendener either by telephone or by mail. (Talbot Dep. 79; Ex. P.) The nature and extent

and the cause of the communications issues are questions of fact for trial.

**IV.**

Upon review of the parties' briefing and construing the evidence in the light most favorable to Plaintiff, the Court concludes that even when the various alleged breaches identified by Defendant are considered together as a whole, there are issues of fact for trial as to whether there has been such a complete failure of consideration that Plaintiff should be prohibited from maintaining this action against Defendant for payment under the contract. Accordingly, Defendant's motion for summary judgment will be denied.

An order consistent with this opinion will be entered.


Dated: June 18, 2009                                /s/ Robert Holmes Bell
                                                    ROBERT HOLMES BELL
                                                    UNITED STATES DISTRICT JUDGE