UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


W.W. WILLIAMS MIDWEST, INC.,

        Plaintiff,

                                    File No.  1:08-CV-410

v.

                                    HON. ROBERT HOLMES BELL

LIEN WAVER, her engines, tackle, and
gear,

        Defendant.

_____/


# O P I N I O N

Plaintiff/Counter-Defendant W.W. Williams Midwest, Inc. ("Williams") filed this action against the Lien Waver, a vessel, seeking payment of the balance due on Defendant's account for labor and materials furnished to the Lien Waver for the repair of its engines. Defendant filed a Counter-Complaint alleging breach of contract and violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.903(e), (n), (s), and (bb).

This matter was tried to the Court on June 29-30, 2009. The Court makes the following findings of fact and conclusions of law in accordance with Fed. R. Civ. P. 52(a).

## I.

Williams is an Ohio corporation with an office and place of business in Kent County, Michigan. Williams's business includes the repair of marine diesel engines.

Defendant/Counter-Plaintiff Lien Waver (the "Vessel") is a 43 foot Viking recreational vessel purchased new in 1996 by the Fickle Miss Corporation, a Delaware corporation, for use by the Schwendener family. Michael Schwendener ("Schwendener") is the Vessel's managing agent.

The Schwendeners have owned several large recreational vessels over the years and they take great pride in the condition of their vessels. From the time the Schwendeners purchased the Lien Waver they had it serviced by Williams, first through Williams's Detroit area facility, and then through Williams's Grand Rapids and Frankfort facilities. The Schwendeners had a positive relationship with Williams prior to the repairs at issue in this case.

The Schwendeners generally use the Vessel from May 1 to November 1. The Vessel is stored during the winter months in a heated building at the Northport Bay Boat Yard ("NBBY"), in Northport, Michigan.

In the summer of 2004, Michael Schwendener developed concerns about the Vessel's engines based upon his understanding that the Vessel's 692 Detroit Diesel engines had a cooling design deficiency and defective top rings that tended to wear out prematurely. Schwendener knew of a similar vessel whose engines were rebuilt because the top rings were close to failure. Schwendener's concerns were also based upon his observation that the engines were emitting black smoke and using oil, and his observation that Vessel had experienced a slight loss of power and a drop in engine rpm.

In August of 2004 Schwendener contacted Williams to discuss repairs to the Vessel's engines. Don Winters, a mechanic employed by Williams at its Frankfort facility, examined the engines and confirmed that the top rings were failing. Winters and Schwendener discussed the option of removing the engines from the Vessel during repairs. Schwendener, in an exercise of caution, elected to have the engines removed.

On August 24, 2004, Williams submitted a quote in the amount of $32,768.24 for partial rebuilding of the engines. (Ex. 1.) Schwendener contracted separately with NBBY to cut the hard top off the Vessel and to hoist the engines out of the Vessel for $13,000. Schwendener's agreement with NBBY did not include disconnecting or reconnecting the engine. Accordingly, Williams amended its quote to include an additional $6,048.00 to remove and install the engines. The total price for the amended quote was $38,816.24. (Ex. 3.) The amended quote included the following comments:

> This quote is for rebuilding both port and starboard engines on the Lein [sic] Waver. This includes teardown, clean up and repair as follows: This includes rebuilding of Heads, repairing injectors as needed. Replacement of cylinder kits, remove and reseal blower to block. Coolant update. This will be completed at our Frankfort facility. The engine will be painted before delivery to site. **This does not include replacement of turbo chargers** . . . . Due to company policy, I will require 1/2 payment down and remaining balance due upon completion of work.

(Ex. 3.) Schwendener added the following language to the quote: "1) All parts to be retained. 2) Work to be completed by Sept. 13th." (Ex. 4.) Schwendener signed the quote on August 31, 2004, and made a $10,000.00 down payment.

3

Winters contacted Schwendener soon after the quote was signed to advise that he would not be able to complete the repairs by September 13. Schwendener had wanted the work done by that date so that he could take a boat trip with his father to the North Channel before the weather turned. However, he was not too concerned about the delay because it was more important to him to have the work done properly.

Winters performed the majority of the work of rebuilding the engines, with assistance from Dale Hendershot, a mechanic from Williams's Grand Rapids facility. However, work on the cylinder heads and injectors was contracted out to AIS Engine Corporation in Grand Rapids.

Winters has over forty years of experience in repairing diesel engines. Following his work as an engine man for the Navy, he worked for Peninsular Diesel (n/k/a Detroit Diesel), Luedtke Engineering, and Williams. Winters has attended more than a dozen diesel training classes during his career. Three quarters of Winters' work at Luedtke Engineering consisted of marine work involving tug boats and construction equipment with underwater engines. Half of Winters' work for Williams since the early 1990s consisted of marine engine work.

Winters began painting the engine with paint he received from NBBY. When he saw that the paint did not match, he obtained Schwendener's paint specifications and ordered the special two part paint from Kaskinen Auto Supply.

Winters completed the engine work and the reinstallation of the engine on September 29, 2004. Winters, Paul Schwendener (Michael's father) and Mark Holtz, the owner of

NBBY, took the Vessel out for a sea trial on September 30, 2004. The engines ran well. Michael Schwendener acknowledged that when he spoke with Winters after the sea trial, Winters was happy and excited about how well the engines were running. Mark Holtz also thought the Vessel ran fine during the sea trial. On September 28, 2004, Williams sent Schwendener an invoice detailing the completed work and showing a total balance due of $28,816.24. (Ex. 12.)

On the first weekend in October, Schwendener scrubbed the Vessel and noticed light hairline cracks in the cockpit gel coat. He also noticed that the paint job in the engine room was rough, with numerous air bubbles and drip marks, and a creamier color of paint than the original. He took the Vessel to Drummond Island the following week and noticed coolant leakage in the engine room. Later in the month, after taking the Vessel on a trip down the North Channel to the Benjamin Islands, Schwendener called Winters to report that coolant was running into the bilge. Winters told Schwendener that during the break-in period leaks were expected, and that he needed to run the engine hard. Williams sent Schwendener an invoice on October 18, 2004, for a total balance due of $28,901.80. (Ex. 13.)

On October 21, 2004, in response to Schwendener's complaint that there was exhaust in the cooling system, Dale Hendershot, the other Williams mechanic who had worked on the engines, examined the Vessel. Hendershot noted that the radiator cap was bad. Hendershot advised Schwendener that Williams would replace the fuel pump even though

it had nothing to do with the engine repair, and that it would replace both radiators caps when the fuel pump was replaced. (Ex. 14.)

In late October Schwendener began directing his calls to Dale Fox, the field service supervisor at Williams's Grand Rapids facility. Schwendener told Fox that he was concerned that there might be a problem in the head or a gasket. He also recited concerns about the color of the paint, oil leaks, coolant leaks, and grit on the dip stick. Schwendener sent oil samples to Williams for testing. After receiving the testing results, Fox told Schwendener that there were abnormally high levels of metals in the oil.

On November 15, 2004, Fox sent Schwendener a memo outlining the additional work Williams was proposing to do to complete the work on the Vessel, and requesting payment if the proposal was acceptable. (Ex. 15.) The additional work Williams proposed to do was to test for compression in the coolant. Because the compression testing needed to be done while the engine was running, Williams proposed to do the work in the spring when the boat came out of storage. Williams also agreed to have the warranty commence when the boat was launched in the spring of 2005. Williams sent Schwendener another invoice dated November 15, 2004, which showed the total due of $28,789.35. The invoice stated:

> Customer reported that the starbord engine was pushing coolant out overflow. There is an oil leak on starbord engine at the turbo. There is a shifting lag in the port engine. Both port and starbord engines have oil and coolant leaking causing staining of paint. Testing for compression in coolant will be tested when boat is launched. Boat is stored for the winter and will be under warranty when boat is launched. Warranty will commence upon launch of boat in spring (estimated date is May 15, 2005.)

(Ex. 16, 11/15/04 Invoice.)

Schwendener did not pay the bill. Instead, on December 7, 2004, he sent Plaintiff a memorandum of thirteen open items that, according to Schwendener, required corrective work:

1)   Starboard engine exhaust leak in coolant.
2)   Treat and flush carbon out of starboard engine.
3)   Provide new coolant.
4)   Replace carboned plastic expansion tank and tubing.
5)   Low fuel pressure alarms have sounded on both engines after a few hours of continuous operation.
6)   Paint engines to specifications with Glacier white #8000 (PPG #2166716389) paint.
7)   Port engine/transmission is slow to engage. A cable adjustment may be necessary.
8)   Properly support and fasten all cables and wires, and provide proper chafe protection.
9)   <u>Both</u> engines have several oil leaks (each side, front & rear). Note: Port engine is spraying an oil mist on the bilge floor near the front pulley.
10)  Provide oil and coolant sample results.
11)  Retain all used parts to present to D.D.
12)  Provide 6 month guarantee from acceptance of engines.
13)  It appears the cockpit gel coat has been damaged from the black runner layed down last summer. When the exhaust manifold was removed, it was placed on the runner.

(Exs. 19, B.)

In the spring of 2005, when Williams returned to work on the Vessel, Williams discovered that the compression problem was caused by the injector tubes; the cylinder head that Williams had installed either had a defective injector tube or the people who rebuilt the head had installed it improperly. In May 2005 Williams replaced the injector tubes. On June

7, 2005, Williams sent Schwendener the warranties on workmanship and parts and the results of the November oil testing. (Exs. 17, 18.) The warranties were to take effect July 5, 2005. (Ex. 18.)

As of June 7, 2005, Williams considered its work complete. Nevertheless, Schwendener continued to express dissatisfaction regarding the repairs. John Talbot, Williams's customer support manager, began fielding Schwendener's calls. In the course of his discussions with Schwendener, Talbot suggested that Schwendener obtain quotes for repainting the engines and repairing the gel-coat. Talbot wanted the quotes so that he could make an informed decision on whether to absorb the cost even if Williams was not responsible for the perceived problems.

On September 16, 2005, Michael Schwendener sent a memorandum to Talbot with a $3,731.70 estimate for gel coat repair, and a $5,012.70 estimate for repainting the engines. Schwendener also sent the results of oil samples from the two engines, and a list of nine open items that he felt still required repair. (Ex. B.) The independent oil sampling company reported that the silicon and wear metal levels were high, possibly from normal break-in, and recommended that the oil be re-sampled at the next oil-drain interval. (*Id.*)

On September 19, 2005, Talbot asked Winters to handle item 8 on Schwendener's amended list of open items ("Properly support and fasten all cables and wires, and provide proper chafe protection."), to make a list of all leaks, and to note what was properly categorized as warranty work and what was not. (Ex. 19.) Based upon Winters's response,

Talbot determined that some of the leaks were attributable to the sight glass, which was outside the scope of Williams's work, that some minor oil leakage from the engine was normal and to be expected, and that the oil usage was within Detroit Diesel specifications. Talbot concluded that Williams had addressed the warranty issues, and that the remaining issues either could not be found, or were not covered by the warranty.

On October 5, 2005, Winters made a service call and tightened some clamps and bolts on the Vessel. (Ex. 20.) Winters also checked on the paint and concluded that the color on the underside of the I-beams was the same as the engine, but that the paint on the deck was whiter. Talbot was not concerned with this difference in paint color because Williams had painted the engine according to Schwendener's specifications, and Williams had not been responsible for painting the deck while the engine was removed. The following day Williams sent Schwendener an invoice reflecting a total amount due of $30,285.48. (Ex. 21.)[1]

During a November 5, 2005, conversation, Talbot told Schwendener that the estimates from the Irish Boat Shop for the gel coat and the paint were too high. Schwendener understood that Talbot was still intending to inspect the Vessel, and that he would be taking some action regarding Schwendener's paint and gel-coat complaints. Talbot, on the other hand, testified that as of November 5, 2005, he did not believe that Williams was responsible

---

[1]The total balance due as reflected on the October 6, 2005, invoice was more than the amount reflected on the previous invoice. The increase may include price increases on parts. However, in this suit Williams is only claiming a principal balance due of $28,816.24, the amount reflected on the September 29, 2004, invoice. (Ex. 12.)

for the paint, the gel coat, or any of the other remaining items on Schwendener's list, and he did not think he left Schwendener with the impression that Williams was going to handle it. He did not, however, explicitly advise Schwendener that Williams would not take any further action on Schwendener's complaints. Talbot made several attempts to reach Schwendener after this date, but Schwendener did not return his calls. At the beginning of 2006 Talbot turned the invoice over to Williams's credit department for collection.

In April 2006 Schwendener left a telephone message for Talbot, advising him that the Vessel was in the water. (Ex. M.) In June 2006, Talbot called Schwendener and left a message that they were playing phone tag and that his next step was to meet Michael Schwendener at the Vessel. (Ex. 25.) No meeting ever occurred. On February 12, 2007, Williams's general counsel sent a certified letter to Schwendener asking him to contact her with any pertinent information that would explain his refusal to pay the invoice, and advising that she was authorized to proceed to suit on this matter. The letter was returned "unclaimed." (Ex. 26.)

In September of 2007, Winters retired from Williams and Williams closed its Frankfort facility. The parts Winters had removed from the Vessel were discarded.

On October 12, 2007, and again on October 19, 2007, Williams left messages with Schwendener to call. Schwendener left a message with Williams on November 8, 2007. (Ex. 25.)

Williams commenced this action on May 2, 2008. (Dkt. No. 1, Compl.) The Vessel was arrested on May 20, 2008. (Dkt. No. 10, Warrant Return.) Defendant filed a counter-complaint on July 28, 2008. (Dkt. No. 18, Countercl.) At his deposition, Schwendener told Talbot that he was making a big mistake and that "this will be more expensive than it is worth."

## II.

In this action both Williams and Defendant are seeking damages for breach of the August 31, 2004, contract for the repair of the Vessel's engines. (Ex. 4.) Williams contends that Defendant breached the contract by failing to pay for the repairs to the Vessel's engines. Defendant contends that Williams is not entitled to payment and is instead indebted to Defendant for breach of contract because its repairs did not correct the original complaint, its repairs were untimely, its work was defective, and its work caused further damage to the Vessel. Defendant also contends that it is entitled to damages under the Michigan Consumer Protection Act (MCPA), Mich. Comp. Laws §§ 445.901-.922.

The parties do not dispute that they had a valid contract for the repair of the Vessel. The contract is maritime in nature and is governed by the substantive law of admiralty. *Kossick v. United Fruit Co.*, 365 U.S. 731, 735 (1961) (holding that a contract to repair a ship is within admiralty jurisdiction). When there is no federal statute or well-established rule of admiralty addressing the dispute, admiralty law may look to the common law or to state law, either statutory or decisional, to supply the rule of decision. *Princess Cruises, Inc. v. Gen.*

*Elec. Co.*, 143 F.3d 828, 834 (4th Cir. 1998). The parties in this case have chosen to apply Michigan law. The Court will do the same.

## A. BREACH OF CONTRACT

The contract provides that the remaining balance is due "upon completion of work." (Ex. 4.) "'As a general rule, there is implied in every contract for work or services a duty to perform it skillfully, carefully, diligently, and in a workmanlike manner." *Nash v. Sears, Roebuck & Co.*, 174 N.W.2d 818, 821 (Mich. 1970) (quoting 17 Am. Jur. 2d *Contracts* § 371, pp. 814-15). The level of skill required is "that degree of skill, efficiency, and knowledge which is possessed by those of ordinary skill, competency, and standing in the particular trade or business for which he is employed." *Id.* "Michigan follows the substantial performance of contract rule." *Gibson v. Group Ins. Co.*, 369 NW2d 484, 486 (Mich. Ct. App. 1985) (quoting 6A *Michigan Law & Practice, Contracts*, § 314, pp 315-316). "A contract is substantially performed when all the essentials necessary to the full accomplishment of the purposes for which the thing contracted has been performed with such approximation that a party obtains substantially what is called for by the contract." *Id.* Where there is substantial performance, minor deficiencies in performance do not cause the substantial performer to forfeit rights under the contract. *Id.*

Williams contends that it substantially performed the contract by October 5, 2005, at the latest, when Winters made the last adjustments to the Vessel. Defendant, on the other hand, contends that Williams has not yet substantially performed the contract because: (1)

the repairs were not completed on time; (2) the engines still do not run well; (3) there are oil and coolant leaks; (4) Defendant caused spider cracking of the gel coat; (5) Defendant used the wrong color paint and applied the paint in an unworkmanlike manner; (6) there are abnormal levels of metal in the oil and grit on the dipstick; and (7) Defendant failed to retain the parts.

### 1. Timeliness

Although the contract provided that the work was to be completed by September 13, 2004, Schwendener conceded at trial that he advised Williams that the quality of the work was more important to him than the specific completion date. Moreover, the proposed completion date was tied to his desire to take a boat trip to the North Channel before the weather turned. He was able to make that trip in the fall of 2004, so the two-week delay did not substantially impair his interests under the contract.

### 2. Engines

Schwendener testified that the engines do not run as well as they should and that the rpms drop at full throttle. There is no dispute that the engines ran well during the sea trial on September 30, 2004. The engines have not been examined or repaired by any mechanic since Williams's work in 2004 and 2005. The only mechanical repairs that have been performed on the Vessel since 2005 were the replacement of the block engine heaters in January 2009, a repair that was unrelated to Williams's work. Schwendener is not a

mechanic, and he offered no expert testimony that his perceived drop in rpms is not within acceptable limits, or that it is evidence of faulty repairs.

### 3. Oil and Coolant Leaks

Schwendener testified that ever since the engines were repaired, he has experienced oil and coolant leaks.

There is no dispute that some of the initial leaks were associated with the faulty injector tubes. Williams replaced the injector tubes in May of 2005. Some of the leaks since that time are associated with the sight glass, which was not within the work performed by Williams. The photographs and the soak pads Defendant offered into evidence to show the extent of the leakage were from June 2009, four years after the May 2005 repairs. Defendant offered no photographs or physical evidence from any time close to the time of the repairs.

Winters and Talbot examined the photographs and opined that the leakage appeared to be part of the normal operation of the Detroit Diesel engines. All those who had knowledge of Detroit Diesel engines, including Defendant's witness Randall Wrubel, a service manager for AIS Engine Corporation, testified consistently that diesel engines are known to leak some oil. The Vessel's oil consumption as reported by Schwendener is within the Detroit Diesel specifications for the engine. Wrubel testified that some of the oil in the photographs appeared to be excessive, but he gave no opinion as to the origin of the leaks, the cause of the leaks, or whether the leaks were related to the work performed by Williams. Defendant has not had any mechanic other than Williams examine the Vessel's engines, so

he has offered no expert testimony as to whether the oil drips are abnormal, what caused the drips, or whether they are related to Williams's 2004 repairs. It appears to the Court that Schwendener is excessively concerned about minor cosmetic matters in the engine room. Even if some of the oil leakage is excessive, it can just as plausibly be attributed to the passage of four years' time since Williams replaced the injector tubes, and to the fact that Williams only performed a partial overhaul of the engines, and some parts of the engines are now thirteen years old. Defendant has not met its burden of showing by a preponderance of the evidence that the leaks are caused by Williams's failure to perform the repairs in a workmanlike manner.

### 4. Gel Coat Spider Cracking

Schwendener testified that there was no spider cracking in the cockpit before the repairs, and he concluded that the cracking must have been caused by Winters when he placed parts of the engine on a black mat on the white gel coat.

There was no definitive testimony about what the likely cause of the spider cracking might be. Theories ranged from torquing, to impact, to heat, to normal wear in a high traffic area. Mark Holtz of NBBY testified that spider cracking in 1996 vessels is common, usually because of stress. Jeffrey Powlowski of the Irish Boat Shop similarly testified that spider cracking was not unusual, but that in his experience, impact was the most common cause. Powlowski had no idea what caused the spider cracking on the Vessel. Talbot testified that

he supposed that the cracking was attributable to the fact that this was an old boat and an area of high traffic.

The Vessel was eight years old in 2004 and the spider cracking was found in a high traffic area of the vessel. The Vessel was also subjected to major work during the relevant time period, including the removal of the hard top of the boat, and the hoisting out and reinstallation of the engines. Williams was not the only company performing work on the boat during the relevant time period. Defendant has not shown by a preponderance of the evidence that Williams caused the spider cracking.

**5. Paint**

Defendant contends that the paint was the wrong color and that it was not applied in a workmanlike manner.

Winters testified that he obtained paint specification numbers from Schwendener and had the paint mixed according to Schwendener's specifications. Schwendener testified that he did not provide specification numbers; rather, he told both Fox and Winters that they should call Johnson Towers with questions about the paint. (Exs. C, D.) The Court finds that Winters obtained the paint specification numbers either from Schwendener or from Johnson Towers. Either way, the specifications were those authorized by Schwendener. Williams also had Kaskinen Auto Supply remix the paint three additional times according to Schwendener's specifications in order to be sure that the paint had been mixed correctly.

Jeffrey Powlowski of the Irish Boat Shop provided an estimate in the amount of

$5,012.70 to repaint the engines. He did not recall anything wrong with the engines that would require repainting, but he testified that he regularly gives quotes on optional work. Mr. Holtz from NBBY did not observe any defects when he inspected the engine room.

Schwendener was the only one to testify that the engines were not properly painted. Schwendener testified that because he went to the expense of removing the engines, he wanted the rebuilt engines to look brand new. The Court finds that Schwendener's expectations were not realistic. If Schwendener wanted the engines to look like they came off the factory floor, it was incumbent upon him to specify in the quote that he wanted the engines to be a professionally painted. Instead, he left the repainting of the engines to the diesel mechanic. It is not realistic to expect rebuilt engines painted by a diesel mechanic in an eight year old Vessel to appear brand new.

Based on the pictures and the painted engine parts produced at trial, the Court finds that there was some variation in the color of the paint and some evidence of dripping. The Court is nevertheless satisfied that the quality of the paint job was within the degree of skill, possessed by those of ordinary engine mechanics.

### 6. Grit on Dipstick and Metal in Oil Samples

Defendant produced evidence that there is grit on the dipstick from the port engine. Defendant has not had the grit examined, and none of the witnesses could identify what the grit is or where it comes from. Winters speculated that it might have come from within the engine when the engine was tipped during the overhaul process. Talbot testified that specks

on a dipstick are normal and not detrimental. He thought it looked like carbon build-up, and diesel engines are known for carbon build-up. Wrubel testified that there could be any number of causes for grit on the dipstick. He offered no opinion as to the cause of the grit on the Vessel's dip stick, whether it was the result of Williams's work, or whether it would have any effect on the operation of the Vessel. There is no evidence that the grit on the dip stick has caused or is likely to cause any trouble to the engine or to the operation of the Vessel.

Defendant has also produced evidence that oil samples from October of 2004 showed an abnormal level of tin and that oil samples from July of 2005 showed abnormal levels of tin and silicon. (Exs. 18, B.)

The independent laboratory that conducted the oil sampling did not indicate that the levels were in the critical category. Although the levels were above normal, the laboratory indicated that they could possibly be from normal engine break-in, and recommended resampling at the next oil drain interval.

Defendant's witness, Mr. Wrubel, confirmed that it is common to have elevated levels of metals in oil samples following a partial overhaul of an engine. Talbot testified that the abnormal tin and silicon readings were not of concern to him because Detroit Diesel recommends a 500 hour break-in period for this two-cycle engine, and the Vessel had not come close to logging that number of hours after the engine repairs.

Defendant has produced no evidence of any additional oil sampling, nor has he produced any evidence that the sampling results were associated with any engine malfunction or with any improper workmanship by Williams.

### 7. Retention of Parts

Defendant's complaint regarding Williams' failure to retain engine parts is a red herring. Schwendener testified that he wanted the parts retained so that he could see if Detroit Diesel would participate in the repair cost. However, Schwendener never asked to retrieve the parts in the three years that elapsed before Williams finally disposed of the parts.

Even if the Court considers all of Defendant's complaints together, the Court concludes that Plaintiff has established that it is entitled to payment under the contract. Winters, who performed the majority of the repairs, is well-qualified in marine diesel engines. He impressed the Court with his competence and candor. All major repairs were completed and the Vessel was available to the Schwendener family to use from July of 2005 on. The Schwendeners have continued to operate the Vessel every year since Williams repaired its engines, and they have operated the Vessel in essentially the same manner as they operated it in years past. They have not had any further repairs done to the Vessel. They have not had any experts examine the Vessel's engines, and they offered no expert testimony that the workmanship was below industry standards. To the extent that Schwendener's complaints can be traced to Williams's work, the complaints are cosmetic in nature and are "problems" only because Schwendener is a perfectionist, not because they are "problems"

under industry standards. The Court is satisfied that Plaintiff established by a preponderance of the evidence that it substantially performed the work required under the contract in a workmanlike manner and that it is entitled to be paid.

Defendant has requested recision of the contract and damages due to Plaintiff's failure to substantially perform its contractual obligations. Because this Court has determined that Plaintiff substantially performed its contractual obligations, Defendant is not entitled to either recision or damages for breach of the contract.

## B. MICHIGAN CONSUMER PROTECTION ACT

Defendant also seeks damages for Plaintiff's alleged violation of the Michigan Consumer Protection Act (MCPA), Mich. Comp. Laws §§ 445.901-.922. The MCPA makes unlawful unfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce. Mich. Comp. Laws § 445.903(1). Defendant alleges that Plaintiff violated the following provisions of the MCPA:

(e) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another.

(n) Causing a probability of confusion or of misunderstanding as to the legal rights, obligations, or remedies of a party to a transaction.

(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer.

(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is.

Mich. Comp. Laws § 445.903(1)(e), (n), (s), (bb).

It appears that in its attempts to address Mr. Schwendener's concerns, Williams created some ambiguity about the extent to which it would resolve the open items on Schwendener's list, such as the paint and the gel coat. However, the Court finds that those misunderstandings concerned matters that went beyond the scope of the contract. Williams performed the work required under the contract in a workmanlike manner, and was entitled to payment. The misunderstandings about what Williams would or would not do to resolve Schwendener's remaining concerns about the paint and gel coat were not unlawful, unfair, unconscionable, or deceptive. They did not affect Schwendener's rights under the contract or his duty to pay for the engine work that was done. Defendant has not established any of its claims under the MCPA by a preponderance of the evidence. Accordingly, the Court finds that Williams is entitled to judgment on Defendant's counterclaim.

### III.

As a general rule, the correct measure of damages for breach of contract in admiralty or maritime cases is the amount necessary to put the injured party in the position it would have been in had there been no breach. *See Jessica Howard Ltd. v. Norfolk S. R.R. Co.*, 316 F.3d 165, 169-70 (2d Cir. 2003) (citing *Chicago, Milwaukee & St. Paul Ry. v. McCaull-Dinsmore Co.*, 253 U.S. 97, 100 (1920); *Seguros Banvenez, S.A. v. S/S Oliver Drescher*, 761 F.2d 855, 860-61 (2d. Cir.1985)).

The principal balance due on the September 28, 2004, invoice is $28,816.24. In addition, Williams contends it is entitled to finance charges in the amount of $19,458.83 from October 1, 2005, to June 29, 2009, and continuing at the rate of 1.5% per month ($14.408 per day or $432.24 per month).

The August 31, 2004, contract provides that the balance is due upon completion of work. The September 28, 2004, invoice provides that finance charges of 1.5% per month[2] will be applied to all accounts in arrears. (Ex. 12.) The work was completed, at the latest, on October 5, 2005, when Williams last performed work on the Vessel. Finance charges began accruing on the contract on October 6, 2005, when Williams sent out its last invoice. The Court has calculated the finance charges from October 5, 2005, to the date of this opinion at $21,179.76 (49 months x $432.24 per month).

Finally, Williams seeks an additional $5,321.05 in expenses arising out of the arrest and seizure of the vessel. The contract between the parties does not call for the payment of the costs of arrest and seizure. Moreover, no proofs were offered at trial as to the amount expended in arresting and seizing the Vessel. Accordingly, the Court will not include the costs allegedly associated with the arrest and seizure in the judgment.

In summary, the Court will enter a judgment in favor of Williams in the amount of $49,996.00.

A judgment consistent with this opinion will be entered.


Dated: <u>November 13, 2009</u>                    /s/ Robert Holmes Bell
                                              ROBERT HOLMES BELL
                                              UNITED STATES DISTRICT JUDGE

---

[2]Michigan's usury statute does not apply to any "time price differential which may be charged upon sales of goods or services on credit." Mich. Comp. Laws § 438.31; *Corrigan v. Insilco Corp.*, 439 N.W.2d 350, 353 (Mich. Ct. App. 1989).